### SALE OF REAL ESTATE BY A CORPORATION.

Common Pleas Court of Franklin County.

THE HARRISON COMPANY V. JOHN H. BLACKER ET AL.

Decided, January 26, 1914.

*Corporations—Binding Character of Agreement Sanctioned ·by all the Stockholders for Sale of Realty—Finding as to Whether a Transaction Was a Loan or a Sale Outright—Estoppel.*

1. The validity of proceedings in connection with a sale of real estate by a corporation can not be thereafter questioned by the corporation on the ground of insufficient compliance with the statute, where all the stockholders sanctioned the making of the sale at the time it was made and at the price which was received, and the transaction was thereupon effected by the board of directors in accordance with the action of the stockholders.

2. The court finds from the evidence and all the circumstances surrounding the transaction, that the agreement entered into between the parties to this case, involving the Harrison Building in Columbus at a valuation of $225,000, was a sale of the property, and was not a loan for that amount.

DILLON, J.

The conclusion to which the court has come in this case is that the agreement which John H. Blacker entered into was a purchase and sale of the property, and not for a loan. The court will take up and the salient points which have been raised in this case and discuss them as briefly as possible.

The claim is made on the part of the plaintiff that no proceedings were had to comply with the statute authorizing a company to sell all its assets, and that Sections 8710 *et seq.*, were not complied with. The essential part of these statutes is that it requires a preliminary vote of three-fourths of the directors, and then that such proposition shall be submitted to the stockholders, at a meeting called for that purpose. The other provisions of the statute simply furnish protection to the directors and stockholders who may not have notice, etc. In the case at bar, the meeting authorizing the transfer contained every stockholder and every director, the two sets being the

same, and the resolution recites the fact that all were present. For two very good reasons, therefore, the deed as such is legal; first, because all the stockholders and directors agreed, and there was a sufficient compliance with the statute thereby; and, secondly, the parties are now estopped to deny their own act,

The fact that the resolution originally provided for a deed to Blacker as trustee, is strongly urged as a potent indication that the transaction was that of a mortgage. The argument on behalf of the plaintiff is that this word "trustee" referred to him as a trustee for the Harrison Company; and that there was no intention to put the title directly in him. Aside from the oral evidence adduced on this subject, the other part of the resolution, contract and deed, are wholly inconsistent with any such theory, as will be mentioned later. But the explanation of Mr. Blacker, as well as some of the correspondence in the case, very satisfactorily explained the theory which caused the word "trustee" to be first written and later expunged. The fact that Blacker had one or more other persons interested with him in furnishing the money for this deal, was known to all the parties, both before the transaction occurred and subsequently. The exchange of letters between Mr. Lentz and Mr. Blacker, later on in the year, also shows that there was a clear understanding as to this.

Reference is here made to exhibits Nos. 103, 104 and 105, covering a period in the latter part of November and extending into the early part of December, 1911. The theory that this expression, Blacker "trustee," referred to him as a trustee for the Harrison Company, or for himself and the Harrison Company, can not be sustained from any view point of the evidence upon that subject.

The value of the property has been one of the big features of this case, and it, of course, plays an important part in any case where a deed, absolute on its face, is sought to be declared a mortgage. Not having any reference to the number of witnesses, but to the weight of the evidence offered upon this subject, the overwhelming weight of the evidence is to the effect that this property at the time of the deed was not worth to

exceed $225,000. First, take the names of the witnesses themselves, Mr. Burdell, Mr. Deshler, Mr. Spahr, Mr. Cooke, Mr. Hardy. In no community of an equal size of the city of Columbus, could a list of persons be found whose testimony could be of greater weight than that of these men. They are men of the highest integrity; men of unquestionably sound judgment and experience, and some of them own office buildings themselves. Mr. Burdell adds to his evidence the fact that upon one occasion they offered to sell him this building for $225,000 with a three year option to repurchase for $240,000, but that he would not offer over $200,000. But aside from the judgment or estimate given by the various witnesses, the most convincing proof is that of the method to determine the value of an office building as laid down by the witnesses, having reference to its gross income, gross expenses, and net earnings, and that part of the evidence which explains how the average life of an office building is shorter than that of an ordinary building, because being located in the central part of a large and growing city, it must keep pace with the improvements that will be demanded by renters twenty years from now. If we would figure, therefore that the life of this building would be thirty-three years, it is quite manifest that in ascertaining what per cent. of profit is being made on the building, there must be a charge off of three per cent. a year. It was suggested at the trial that this was not a fair basis at all because the owner is not supposed to have the principal at the end of the life of the building, but this is not tenable. The testimony is that they all do that in figuring the net income. The way the net profit was figured on the part of the plaintiff, would simply result in the company robbing itself of about three per cent. every year, taking it out of the principal and counting it as interest. The situation is no different from that in which a man might loan $100,000 for ten years at the rate of four per cent. He might have the debtor pay him the four per cent. and then pay him three per cent. on the principal each year and imagine he was getting seven per cent. instead of four. In other words, at the end of the ten year term, the lender would be entitled to receive his entire $100,000 back again.

Another fact that stands prominent in this case is that there was absolutely no reason why the corporation should not have recited the true facts in the resolution. The only reason urged was that they did not want the public to know that they were thus involved. In this connection, permit me to animadvert to a part of the discussion in the briefs, which refers to Mr. Lentz's statement that the making of this deed to Blacker in the form it was made was to make the public believe that it was in the hands of a *bona fide* owner. It was entirely unnecessary for counsel for the plaintiff to explain the meaning which Mr. Lentz had when he used the expression "fool the public." It is a matter of common sense, and good business sense at that, where a large piece of property is heavily involved, and where the field of purchasers is very small, that a possible purchaser should not feel that the company was already being squeezed to death and that he could get it at most any price and at a forced sale.

But recurring now to this alleged reason for not reciting the fact in the resolution and deed, this reason is entirely destroyed when we realize that the agreement to reconvey was put upon record almost immediately. Men in dealing with a large and valuable piece of property such as is involved in this case, would certainly not take any chances as to what the terms were, and especially in so far as their own resolution is concerned, which is private property. And further, if this was simply a loan, it is almost impossible not to believe that the secretary, who was active throughout the entire transaction, would not have had some inkling of it. A corporation is supposed to act through its directors, and while I do not fail to realize that the fictitious entity is not controlling, but that the directors and stockholders themselves in their action may speak for it, that the officers, directors and even stockholders sometimes, under certain circumstances, can control it and act for the corporation, nevertheless we must not lightly treat the solemn and formal action which these directors and stockholders have taken. It is true that there was some talk of a loan between these parties in the summer or early fall of 1910. But it is likewise true that that form of relief never materialized.

In referring to the solemn written instruments which have been executed in this case, we must remember that the very basis and soul of the parol evidence rule is the protection of the parties in the agreement which they have made. Where parties, after their various discussions and counter-propositions, have finally sat down and made a sole memorial of their agreement, it is not lightly to be talked away or modified; and we must bear in mind that this applies just as strongly where there are five or six on one side and only one on the other, as where there is only one on each side. In other words, the fact that six men may obligate themselves to pay another man a sum of money or perform some work for another man, does not deprive that one man of his right to see to it that that memorial shall not be talked away, simply because there are more people on the other side. He is clearly entitled at the hands of the law to exactly the same protection as if the same number of people testified on his side as on the other. Otherwise the protection which the law affords by these written memorials would be inequitably administered.

Attention is again called by counsel to the fact that by the terms of the contract executed between Blacker and the Harrison Company in accordance with the resolution of the corporation, it is expressly agreed that "the taxes to be levied for the year 1911, be pro rated up to the time the option is exercised." It is further recited in the resolution of the corporation (Exhibit No. 13), "Resolved that this company sell its property, known as the Harrison Building," etc.; and further; and very significant, in the same resolution is recited, in mentioning the terms, that "John H. Blacker is to assume the mortgage of the Western & Southern Life Insurance Company of $150,000 with accrued interest thereon, and the second mortgage to Walter R. Martin for the sum of $25,000 with accrued interest thereon." This makes John H. Blacker the only solvent one of the two parties to the transaction, liable exactly the same as if he had personally signed these obligations, a situation which is wholly inconsistent with a man who would be loaning the sum of $65,000 or less to the corporation.

Again, in the deed which the company executed to Blacker, in addition to assuming those two obligations, he also agrees and does assume "the taxes for the last half of the year 1910" as part of the consideration, a fact wholly inconsistent with the theory of a mere loan, since the duty of paying these taxes of course, would devolve upon the real owners, and Mr. Blacker would not be making any such agreement if that were the real situation.

Again, a feature which distinguishes this from many of the cases in which a concomitant agreement is made to reconvey, is this, in nearly all these cases the agreement to recovery is for the same amount as the consideration paid or recited in the deed, together with a certain stipulated rate of interest, which very strongly indicates the fact that the deed was intended as a mortgage.

Again, by reference to Exhibits Nos. 103, 104 and 105, heretofore referred to, we find Mr. Blacker writing on November 21, informing Mr. Lentz that he had talked "over with his people the matter of extension of the option on the Harrison Building, but they were not willing to grant any further extension of time other than that called for in the option"; and also the letter winds up with the hope that Mr. Lentz will "get busy and find a buyer." This is answered by Mr. Lentz in his letter of December 2, in which he even suggests to them a new consideration for which they would give Mr. Harrison an additional year, but outside of the use of the word "redeem" with reference to Mr. Harrison, there is nothing in the correspondence which would indicate that the parties were dealing on any other theory at all than that which was expressed in writing between them.

I now come to discuss the question of presumption. At the outset we must remember that the old classifications, and which will be found in the older works with reference to presumption, have been clarified so that the so-called presumptions of fact today are obsolete, as they deserve to be. The old classification divided presumptions into two classes, namely, presumptions of law and presumptions of fact. Then presumptions of law were

divided into two classes, those which were disputable as, for instance, the presumption of death where absence has taken place for seven years, and conclusive presumptions, such as that a child under seven years of age is incapable of committing crime. The so-called presumptions of fact are nothing more than logical inferences. That is to say, a set of facts which are so clear and satisfactory that a person could have but one reasonable, logical inference. Nevertheless, it is not the province of a court blindly to assume any particular inference as a matter of law, and the court dare not so charge a jury, where it is purely a matter of so-called presumption of fact. To illustrate my point a little more clearly, we must remember that a presumption is a rule of law which attaches a definite probative value to a given set of facts. Thus, the court will charge the jury that if they find a man has been absent and unheard of for seven years, the jury must find that he is dead whether they think so or not. It does not leave the jury the privilege to go into their room and deliberate as to whether the man is dead. The law has attached a definite probative value to that state of facts, and therefore, the judge instructs the jury that they must find him dead, whether they think so or not. The trouble with the use of the word ''presumption'' arises, just as we find it in the case of *Marshall* v. *Stewart*, 17 Ohio, 356. The syllabus in that case, decided in 1848, in substance, is that where land is conveyed by an absolute deed, and the vendee at the same time delivers to the vendor a contract by which he agrees to reconvey the premises by a specified time upon the repayment of the purchase money with interest, the circumstances furnish presumptive evidence that the deed was intended as a mortgage. The expression ''presumptive evidence'' will not stand strict analysis. It was simply an expression by the court that the facts in the case were such that it would justify a finding that the deed was a mortgage.

Beginning with that case and following the cases through, including the case of *Wilson* v. *Giddings*, 28 O. S., 554, it can not be maintained that there is any presumption of law upon this subject in Ohio. Each case must of necessity stand upon

its own facts and circumstances. Scarcely any two cases are exactly alike. The unfortunate use of the word "presumption" by judges from time to time has led to some confusion upon the subject. The presumptions of law are well settled and have been well settled for many, many years.

If, as claimed by learned counsel for the plaintiff, a presumption immediately arose upon the introduction in evidence of the two instruments in this case, how strong is that presumption? How weighty is it? How much evidence will it take to balance it? Are we to ignore all the other facts and surrounding circumstances in this case?

The so-called ear marks are not all present in this case. Some of them, such as the vendor's financial embarrassment, are equally present in most genuine deeds and conveyances. It is the wants of people which compel them to bargain and deal. Sitting as a trier of fact upon this particular issue, I feel satisfied that, commencing with the appraisement in the United States Court of $149,333.33, made in 1906, up to the present date, if we should treat this transaction as a loan and a mortgage for $215,000, and would then proceed under its terms to enter a decree of foreclosure, at no time would it sell for enough to leave any surplus whatever to go back to the possession of the Harrison Company.

The appeal bond will be fixed at sufficient amount to cover the costs made here and to be made in the upper court. If the parties do not agree upon the amount, the court will fix it before the entry goes on.